6641

## STATE v. EMERSON.

1. EVIDENCE—MURDER—SELF-DEFENSE.—In trial for murder for killing a father in room of daughter, under plea of self-defense, testimony to the effect that another had been forced thirteen years before to marry the daughter on account of unchaste relations with her is too remote. If offered to show estrangement between the father and daughter, its exclusion was harmless, as that fact was testified to by the same witness in chief.

2. IBID.—It is not reversible error to exclude evidence as to matters already in evidence and undisputed.

3. IBID.—SELF-DEFENSE.—Where the only evidence of illicit intercourse between defendant and deceased's daughter was of an occurrence ten years previous, it is not competent to show the father had *knowledge* of such relation as tending to show the attitude of the deceased toward the defendant at the time of the homicide.

4. IBID.—DECLARATIONS—CONTRADICTION.—It is not necessary that a defendant in a murder case be advised of the purpose to put his declarations as to a matter in issue in evidence, but where he is advised of a particular conversation with one person and gives his version of it, in reply he may be contradicted by another, who says he heard the conversation, but whose name was not given to defendant on his examination as being present at the time. Under the facts here that Solicitor asked the witness in reply the substance of the conversation is not reversible error. The substance of a conversation may be given by a witness, if he cannot recall the exact words.

5. SELF-DEFENSE.—IT WOULD BE MANSLAUGHTER for a father to kill a man whom he detects in his home in illicit intercourse with his daughter, who is a member of his family. Such wrongful act on the

part of the paramour would be reasonably calculated to stir the passion of the father and provoke an attack by him, such as would deprive the paramour of any right of self-defense should he kill the father who attacks him on the spot. This doctrine read by the Court in his charge from the opinion in the case of *Dabney* v. *State,* 113 Ala., 58, is the law of this State.

6. IBID.—There is nothing in the evidence in this case to warrant the inference that the father had so abandoned his daughter to a life of shame as not to be moved to ungovernable wrath by witnessing her further pollution, so that defendant could say he was without fault in bringing about the necessity to kill the father.

*Varnell* v. *State,* 26 Tex. App., *distinguished from this case.*

7. IBID.—MURDER.—There was evidence here tending to show defendant armed himself with a pistol in anticipation of some one interfering with his purpose and with the intent to take the life of such one should it be necessary to save his own in the course of such interference. This evidence made the charge, based on the Alabama case, applicable to this case. If such was defendant's formed design, he is guilty of murder.

8. IBID.—The portion of the charge complained of as not giving the defendant the benefit of the doctrine: If one is not without fault in bringing on a difficulty but abandons the conflict in good faith, his right of self-defense survives, and that defendant should be acquitted if there be reasonable doubt of his guilt, could not have prejudiced his case as this doctrine was fully covered in giving two of defendant's requests.

9. IBID.—Refusal of request as to duty to retreat if thereby his danger is increased was not prejudicial, as the doctrine was charged more clearly and more favorably to defendant in the main charge than as stated in the request.

Before GARY, J., Anderson, January Term, 1907.  Affirmed.

Indictment against J. Allen Emerson for murder of Thomas F. Drake.  From sentence of imprisonment for life, defendant appeals.

*Messrs. Bonham* and *Watkins* and *Cothran, Dean & Cothran,* for appellant.  The former cite: *As to mitigation of homicide of paramour of daughter by father to manslaughter:* 26 Tex. Ap. Cas., 56; 50 S. C., 405; 5 L. R. A.,

809; Whar. on Hom., sec. 188; 55 S. C., 32. *If one not without fault in bringing on a difficulty, abandon the conflict, his right to self-defense survives:* Clarke's Crim. L., 155; 25 Ency., 270; *Fountain* v. *State,* 55 L. R. A. *Judge should charge or refuse each request:* 43 S. C., 130. *As to the doctrine of retreat:* Duty's Crim. L., 483; 72 S. C., 203; 66 S. C., 473. *Drake had no right to shoot Emerson as a tresspasser until he had tried other means to eject him:* 76 S. C., 142; 43 S. C., 116.

The latter cite: *What is meant by, Without fault in bringing about the difficulty?* 75 S. C., 494; 30 Tex. App., 640; Clark Cr. L., 157. *It would have been murder in Drake to kill Emerson with knowledge of his daughter's unchastity:* 17 S. E., 990; 38 S. W., 186. *It was error not to permit Belle Bailey to say she had informed defendant her father never entered her room:* 35 S. C., 197; 22 S. C., 89; 25 S. C., 318; 32 S. C., 410; 30 S. C., 490; 51 S. C., 69; 43 L. R. A., 225; 21 L. R. A., 409; 52 Am. St. R., 717; 77 Pac., 1113.

*Solicitor J. E. Boggs,* and *Messrs. Martin & Earle, G. C. Sullivan* and *Paget* and *Watkins,* contra.

*Messrs. G. C. Sullivan, B. F. Martin* and *T. Frank Watkins,* cite: *Notice to defendant of purpose to contradict is not necessary:* 43 S. C., 107. *Discovering daughter and her paramour in bed is provocative of a difficulty:* 43 S. C., 217; 21 Cyc., 810; 83 Ga., 744; Whar. on Hom., sec., 334. *Defendant being a tresspasser cannot invoke the plea of self-defense:* 75 S. C., 494; 21 Cyc., 809. *Refusal to charge a request is not error if point is covered by main charge:* 75 S. C., 544; 49 S. C., 285; 33 S. C., 99. *As to the doctrine of retreat:* 24 S. C., 283; 28 S. C., 36; 75 S. C., 510.

September 6, 1907. The opinion of the Court was delivered by

Mr. Justice Jones. The appellant was indicted for the murder of Thomas F. Drake, and, upon being convicted with a recommendation to mercy, was sentenced to life imprisonment, from which appeal is taken upon numerous exceptions.

The homicide occurred on the night of August 12, 1906, in the home of the deceased in Anderson County. Mrs. Belle Bailey, a married daughter of the deceased, about thirty-one years old, was living in the home of her father, with her child Mary, about thirteen years old and her brother Ralph Emerson. The defendant, a sergeant of the county chain gang, left camp some fourteen miles from Drake's for the purpose of visiting Belle Bailey in her bed room. Hitching his mule in the woods near the house, he went to the open window of the bed room and discovering a knot in the curtain, the signal agreed upon between them, he entered through the window. He placed his coat and pants upon the floor and his pistol on top in reach from the side of the bed and got in bed with Belle Bailey. The deceased occupied a room just across the hall and nearly opposite Belle Bailey's room. Deceased got up during the night and set a lighted lamp in the hall on a table standing almost opposite Belle Bailey's room door, which stood slightly ajar. Belle said to her paramour, "There is a light, Allen," then got out of bed and started towards the door. She testified that her father pushed the door open before she reached it, that she asked him what he wanted and he said, "I want to hear a fuss," that he had a pistol in his hand, that she heard Allen say, "Don't shoot," that her father immediately fired towards Allen, that Allen shot his pistol, that her father immediately started to shoot again, when Allen shot the second time and her father fell away from the room door into the hall. The deceased was shot through the heart and died immediately. The defendant testified that when Belle punched him in the side and said, "There is a light, Allen," he raised up in bed and saw the door open and Drake with a pistol in hand, that he said to Drake, "Don't you shoot me," and bent over in bed

to get his pistol and while in that position Drake fired, the ball grazing and cutting the skin on his back, that he (defendant) then fired into the ceiling above to ward him off and get a chance to get out of the room, that Drake was about to fire again when defendant fired as quick as he could and Drake disappeared, that he then left the room without his clothes and went to where his mule was hitched, and that Belle brought the clothes to him there. The defendant and Belle went off together to Anderson, the defendant voluntarily surrendered to the sheriff and Belle went to Atlanta.

The defendant set up the plea of self-defense, and the real struggle in the case was on the point whether defendant was without fault in bringing on the difficulty. On this issue defendant sought to show the cause of Belle Bailey's marriage with William Bailey, some thirteen years before the homicide, that her father knew of her unchaste character and her previous relations with the deceased, that he was estranged from his daughter by reason of her conduct, that he never spoke to her or entered her bed room, that defendant knew of this relation, and therefore did not expect to encounter the father on his visit to the daughter.

The first exception assigns error in the Court's refusal to allow defendant's counsel to ask the witness, Ralp Drake: "Do you know the immediate cause of her marriage at that time? Why was it she got married just at that time?" The object was to show that the marriage was forced because Belle was with child by William Bailey. This was properly excluded as too remote and as not throwing any light upon the homicide occurring thirteen years afterwards, and there being nothing to connect the circumstances of that marriage with the defendant or the homicide. If the purpose of the testimony was preliminary to showing an estrangement between Belle Bailey and her father because of her unchaste conduct and the improbability of the defendant encountering the father in her bed room, the ruling was harmless, as it was an undisputed fact in the case established by the State's witness, Ralph Drake, at folios

25-26, that the relation between Belle and her father was not friendly, that he had not spoken to her for ten or twelve years, and that he never entered her room.

The basis of the third exception is the alleged refusal of the Court to allow the witness, Belle Bailey, to answer the question, "Did you make it known to him (defendant), that your father did not communicate at all with you?" The case at folio 74 shows the following in the examination of Belle Bailey:

"Q. You need not state what you said to Allen Emerson, but I will ask you this question, whether or not you made it known to him, that your father never, under any circumstances, came into your room? A. I have. Q. You told him that? A. Yes, sir."

After this, when the question referred to in the exception was asked, objection was made by the Solicitor and the Court sustained the objection. This cannot constitute reversible error, if it be conceded that the testimony was competent, for the question, in so far as it relates to whether Drake ever entered her room, had previously been answered without objection and remained as testimony in the case. Moreover the defendant, at folio 149, testified that he knew Drake never had any communication with Belle and never visited her room, and that he had no reason to expect to meet Drake in that room. It is not reversible error to exclude testimony as to matters already in evidence and undisputed. The fact that Drake did not speak to his daughter or visit her room was proven by the State, as already remarked, and was not a matter of dispute.

The second and fourth exceptions charge error in refusing to allow the following questions to be propounded to the witness, Belle Bailey: "Do you know whether or not your father was aware of this relation between yourself and Allen Emerson?" "I wish you would state to the jury whether or not your father had knowledge of the fact that there had been illicit relations between you and Allen Emerson, the defendant." The witness, Belle

Bailey, had just previously testified that ten years before she gave birth to a child, and that the defendant was its father, but there was at that stage in the case no testimony of any other improper relation between the parties up to the night of the homicide. So we are bound to assume, the purpose of the question was to ascertain whether the deceased knew of the illicit relation which had existed between his daughter and the defendant ten years previously. The Circuit Court ruled that the testimony might be relevant and admissible if Drake, the father, had on this occasion killed the defendant and was on trial for the same, but that it was not relevant to the issue in this case. The appellant contends that the father's knowledge of the unchaste relation between defendant and his daughter would be a material and relevant circumstance, in determining whether the father's attack upon defendant was in revenge for past wrong, and therefore malicious, or was the result of heat and passion aroused by suddenly discovering the adulterer in his house in the bed with his daughter; that if Drake would have been guilty of murder had he killed defendant, the defendant had the right to defend himself against such malicious attack, and that if the deceased knew of the unchaste relations of his daughter with defendant and had ceased to communicate with her, defendant could not reasonably have anticipated an encounter with the deceased, and therefore was without fault in bringing on the difficulty.

This contention is plausible, but not sound. It will be observed that the question was not so framed as to indicate to the Court that it was intended to show that the *defendant was aware* that the deceased had knowledge of his previous illicit relation with his daughter, on the contrary, the plain import was merely to show the knowledge of the deceased. If defendant was not aware that deceased had such knowledge, the fact of the deceased's knowledge could have no influence in prompting or explaining the conduct of the defendant.

Is the testimony competent as tending to show the attitude of deceased towards the accused at the time of the homicide? To be so it must fall within the rule governing the admission of evidence of previous quarrels, ill feeling or hostile acts between the parties. The rule on that subject is thus stated in 21 Cyc., 962: "Where there is a claim supported by some evidence of self-defense, or, as it has been well stated, where the proof justifies the giving of a charge on the law of self-defense, defendant may for the purpose of showing deceased to have been the aggressor, and the killing to have been necessary in self-defense, introduce evidence tending to show that deceased entertained hostile feelings towards him. Thus he may show that there had been previous difficulties or quarrels between himself and deceased, or that previous to the killing deceased had been guilty of acts and conduct evincing hostility towards defendant. Defendant may show that on former occasions deceased assaulted or attacked, beat, waylaid or shot at him. There must, however, be some connection between the previous difficulties and the homicide; defendant cannot go back to a remote period and prove a particular quarrel or grudge unless he also proves a continued difference flowing from that source; but where there has been a series of difficulties down to the time of the killing, defendant may introduce evidence of previous affrays, difficulties and attacks, although remote in time and place, their weight being for the jury."

In *State* v. *Faile,* 43 S. C., 62, 20 S. E., 798, it was held competent to give in evidence uncommunicated threats by the deceased against the accused made two weeks before the homicide, and in *State* v. *Thrailkill,* 71 S. C., 142, 50 S. E., 551, it was held competent to show that the deceased approached the scene of the difficulty armed with a gun with knowledge that the accused had just previously killed his brother. This and similar rulings are upon the ground that the evidence reasonably tends to show a hostile attitude by the deceased against the accused at the time of the homicide and to illustrate or interpret his action. But in this case the

attempt is not made to show any previous threat or hostile demonstration by the deceased, but mere knowledge by the deceased of defendant's former conduct. The remoteness of the act sought to be put within the knowledge of the deceased and the failure to offer or attempt to connect it with the homicide, justified the Circuit Court in excluding the evidence. *Daniel* v. *State* (Ga.), 29 S. E. Rep., 769. In judging the mental attitude of the deceased at the time of the homicide, it would be absurd to attribute his conduct to ill feeling engendered by information of an old wrong, the continued existence of which had not been manifested by any hostile word or deed, rather than to the overwhelming indignation and fury engendered by another similar wrong just perpetrated or about to be perpetrated under his roof. *State* v. *Johnson,* 2 Jones' Law, 64 Am. Dec., 582. Moreover, the defendant instead of showing the continued existence of ill feeling by the deceased caused by his former conduct, testified to the contrary, for at folios 167, 183, 184, 191 and 192, he testified to the effect that his relations with the deceased were not unfriendly, that some eight or ten years before the homicide he made explanation of his relations with Belle to her relatives, Jesse Drake, John Drake and the deceased, Jesse Drake being spokesman for the party, that Jesse Drake was satisfied with his explanation, and that deceased never complained after such explanation. This testimony was not disputed. These exceptions must, therefore, be overruled.

The fifth exception assigns error in permitting the introduction of a note written by Emerson to Mrs. Bailey about a year before the homicide. As neither the note nor a statement of its contents appears in the "Case," we are unable to consider the exception.

A witness for the State, F. D. Suber, testified that on the day after the homicide, he heard a conversation in the jail between defendant and William Bell, in which defendant said, "There was a light burning in the hall and the door opened and Mr. Drake made a dark

place between him and the door, and he was the best target
he ever had to shoot at." The defendant, when examined,
denied having made such a statement, and testified that what
he said was: "When the door opened it blinded me and the
light shined on me and made the best target out of me for
him to shoot at I ever saw." In reply, the witness, C. B.
Prince, over objection, was permitted to testify that he was
present during the said conversation in the jail, and in an-
swer to the question: "Did you hear defendant say that
Drake was the best target he ever shot at?" the witness an-
swered, "Yes." The defendant's counsel then requested
that the witness be asked to state the exact language, where-
upon the Court sustained the Solicitor's contention that it
was not necessary to give the exact language used, but that it
would be sufficient to state the substance of the conversation.

The sixth exception alleges error in the following particu-
lars: (1) the defendant had not been asked as to any conver-
sation to which Prince was a party and had no opportunity
to deny it; (2) defendant had the right to have witness re-
peat the exact language in order to test the accuracy of his
memory; (3) in the form in which the question was put
witness was made to simply repeat Suber's statement.

Statements or declarations of the accused relative to mat-
ters in issue may be given in evidence whether he goes on the
stand as a witness or not, and, therefore, if he testifies it is
not essential that he be advertised of the purpose to give his
declarations in evidence. *State* v. *White,* 15 S. C., 391;
*State* v. *Freeman,* 43 S. C., 107, 20 S. E., 974. The ac-
cused in this case was particularly advised of the particular
conversation and gave his version of it. It was competent
*in reply* for the State to corroborate the testimony of Suber
by the testimony of another witness who was present at the
time. When it is desired to give the declaration of the ac-
cused in evidence, it is proper, when it is possible to do so,
to give his exact words, but if the witness cannot state with
certainty the exact words, it is competent to state the sub-
stance of the declaration, and the accuracy and truth of the

witness may be tested under cross-examination.   When the particular form in which the question is put is the point of exception, timely objection should be made so as to give the Court an opportunity to see that the question is in proper form before answer, which was not done in this case.   We, however, see no ground for reversal on account of the form of the question under the circumstances.

In the course of the charge to the jury the Court read the case of *Dabney* v. *State,* 113 Alabama, 38, 59 Am. St. Rep., 92, 94, and declared that such is the law of South Carolina, and this charge is the basis of the seventh, eighth, ninth, eleventh and fifteenth exceptions.   In that case Faulkner on the night of the homicide discovered Dabney in the room of Faulkner's wife under circumstances indicating preparation for adultery.   Faulkner demanded admittance and on being refused proceeded to break down the door, and upon entering was shot by Dabney after Faulkner had stated that he had come to kill both of the parties and was advancing with pistol drawn and pointed at Dabney, who had no means of escape except through the door.   Dabney having appealed from a conviction of murder in the second degree, the Supreme Court of Alabama rendered an opinion containing the following extracts, which were read to the jury by Judge Gary on the trial of this case:

"It is, and always has been, an elementary principle of criminal law, so familiar as not even to require a citation of our own numerous adjudications upon it, that one who provokes a difficulty—who by his own wrong contributes to a situation out of which arise a necessity to take the life of another to preserve his own—cannot invoke the doctrine of self-defense to justify the homicide he commits in such difficulty—cannot plead a necessity to kill which arose from his own wrong.   Sexual intercourse with the wife of another is such a wrong, so obviously calculated to bring on a difficulty with the husband, as that the law itself recognizes it as provocation sufficient to reduce the killing of the adulteress

and her paramour by the husband, upon detecting them in the act, to manslaughter—a wrong which is an adjudged provocation to homicide on the part of the husband. If, as in the case at bar, the paramour, in order to save his own life from the consequences of the deadly passions of the husband, excited by the wrong of the former, slays the husband, he can in no sense be said to have been free from fault in bringing about the mortal rencounter; the fatal result, to the contrary, is traceable directly to his own wrong, and he cannot justify his act by an invocation of the doctrine under which one free from fault and unable to retreat is authorized to save his own life by destroying that of another.

"It is also a too elementary and familiar principle of law to need discussion or reference to authorities, that if one entering upon the commission of a wrongful act has in contemplation that another will or may interfere with his enterprise, arms himself with a deadly weapon with the intent to take the life of that other should it become necessary to save his own in the course of such interference, and who in fact does take the life of the person so interfering in pursuance of such intent, is guilty of murder in the first degree; the intent to kill under the conditions contemplated constituting the 'formed design' sufficient and necessary in murder, when the circumstances of the act do not justify the design, and the wrongfulness of the act in which the slayer was engaged at the time, the necessity to strike arose, precluding all justification of the design."

Error is assigned to this charge in the following particulars: (1) It was inapplicable to the facts of this case and tended to excite the jury against the defendant; (2) It is not an adjudged provocation to homicide if a father find one in cohabitation with his daughter of known immoral character whose immorality had so estranged him that he ceased to treat her as a daughter; (3) That it erroneously conveyed to the jury as the opinion of the Court that the defendant had precluded himself from setting up the plea of self-defense, and that it was lawful for Drake to kill Emerson because of

his cohabitation with the daughter of deceased. (4) There was no evidence that defendant in this case "armed himself in anticipation that any one might or would interfere in his purpose and with intent to take the life of the other should it become necessary to save his own in the course of such interference, etc." (5) That having charged at defendant's request that one who knows the unchaste character of a female will not be excused for assaulting one found in cohabitation with her to the same extent as would one who had no previous knowledge of the woman's lack of virtue, it was error to give to the jury the facts and law of the Alabama case, the two propositions being diametrically opposed.

There is no doubt that the common law rule prevails in this State that if a husband discovers one in the act of adultery with his wife and immediately kills him he is guilty, not of murder, but of manslaughter; upon the ground that the adulterous act is an act of aggression against the husband, constituting in law a sufficient provocation to engender the heat and passion which negatives malice. In 4 Bl. Com., Sharswood Ed., p. 190, we find: "So if a man takes another in the act of adultery with his wife and kills him directly upon the spot, though this was allowed by the law of Solon, as likewise by the Roman Civil Law (if the adulterer was found in the husband's own house) and also among the ancient Goths, yet in England it is not absolutely ranked in the class of justifiable homicide, as in case of a forcible rape, but it is manslaughter. It is, however, the lowest degree of it; and therefore, in such a case the Court directed the burning in the hand to be gently inflicted, because there could not be a greater provocation." In *State* v. *Chiles,* 58 S. C., 49, this Court approved as correct a charge that it would be manslaughter for a husband to kill one while in the act of adultery with his wife.

The same principle should apply where a father kills one whom he detects in illicit intercourse with his daughter, especially if she be a member of his houshold and under his roof, as the cases stand upon the same footing of reason and

justice. 21 . Cyc., 753; *State* v. *Grugin,* 147 Mo., 39, 71 Am. St. Rev., 553; 42 L. R. A., 774. If such a provocation be sufficient to mitigate a killing of the paramour by the father to manslaughter, it is surely a wrongful act reasonably calculated to stir the passion of the father and provoke an attack by him, such as would deprive the paramour of any right of self-defense should he kill the father who attacks him on the spot. The law of self-defense, as repeatedly declared in this State, requires that the slayer shall be "without fault" in bringing on the difficulty. One is not "without fault" who does that which a reasonable man would expect to bring on a physical encounter and which did actually contribute to bringing it on. *State* v. *Rowell,* 75 S. C., 510. If we concede that defendant had no reasonably safe means of escape and shot Drake to save his own life, his plea of self-defense is unavailing, because by his own guilty act he brought on the necessity to kill.

Hence the principle of the Alabama case as given to the jury on the subject of self-defense was sound and applicable, unless it be true, as contended by appellant, that the knowledge by the deceased of his daughter's former acts of unchastiity, and the estrangement between them because of such conduct and the fact that defendant knew of the estrangement and of the father's habit not to visit his daughter's room are circumstances which have some tendency to show that defendant was without fault in bringing on the difficulty. We are clearly of the opinion that these circumstances cannot have such effect. The fact that Drake did not visit his daughter's room for communion and companionship as a father, furnished no sort of reason for believing he would not, as master of his home, go there to eject an invader of its sanctity. Emerson's visit was admittedly clandestine, so far as Drake was concerned, and there is no foundation in the evidence for a suggestion that Emerson was there by the acquiescence or implied invitation of Drake, or that Drake had set a trap for him with a view to kill him, hence the doctrine of *Wilkerson* v. *State,* 91 Ga.,

729, 44 Am. St. Rep., 63, has no application. In the case of *Varnell* v. *State,* 26 Tex. App., 56, much relied upon by appellant, the defendant and a daughter of deceased were guilty of illicit intercourse thirty or forty yards from the house and away from the deceased, who, after being informed of what had happened, went to the place, his daughter having fled to the house, and there attacked defendant with an axe and was killed by him. The Court held that upon these facts the defendant had not lost his right of self-defense. This was manifestly on the theory that the deceased attacked the defendant in that case in revenge for what had occurred out of his presence, and the case is distinguishable from the case at bar. In Varnell's case the deceased attacked upon information of a completed act done out of his presence; in the case at bar, the deceased attacked for an act in progress under his roof and in his sight. Drake being in his own home had a perfect right on hearing a noise to arm himself, place a light on his table and approach the door of his daughter's room, which stood ajar, and ascertain the cause. If he had reason to believe a man was in his daughter's room for an unlawful purpose, he not only had a right to push open the door and use whatever force was necessary to eject the invader of his home and family honor, but it was so natural and probable that any father would do so under such circumstances that it would be unreasonable, indeed foolhardy, for the treaspasser not to expect a possible encounter with the father. The law will not give immunity or amelioration from the natural consequences of doing a criminal act in proportion to the secrecy and frequency with which it is committed. The law will not heed Emerson when he says: "I have entered Drake's home before for immoral purposes without discovery. I have reliable information that Drake never enters his daughter's room. I do not, therefore, expect to meet him on my secret and noiseless visits there at night. If I should happen to meet him and, contrary to my expectation, he assaults me during my criminal act in his home, the law of self-defense will protect me if

I kill him to save my own life, because I am without fault, having done nothing reasonably calculated to bring on a difficulty." The bare statement shows how untenable is the contention based upon the alleged belief of Emerson that he would not encounter Drake that night. It is sufficient to know that he did encounter Drake in his home, where he had a right to be and where Emerson had no right to be.

But it is said the testimony supports a theory that the father had knowledge of his daughter's unchastity, and because of this was so estranged from her as to have abandoned her and lost all concern about her conduct and welfare, and that, therefore, he did not attack defendant in sudden heat and passion upon a new provocation, but in revenge for past wrong, which clothed defendant with the right of self-defense.

No reasonable view of the testimony warranted an inference that the father had so abandoned his daughter to a life of shame as not to be naturally moved to ungovernable wrath by witnessing her further pollution. It is true, Emerson testified that he had been making similar visits to the room of Belle Bailey once or twice a month during 1906, but there was no attempt to show that Drake acquiesced in it, or that he was aware of it. Drake undoubtedly knew of the daughter's downfall many years before, and his proud heart was so stung and humiliated by it that he did not entirely forgive her, yet the undisputed testimony is that by his wish she was living under his roof as a member of his household. She kept the house and did the cooking, but there was nothing unusual or degrading in that. Her sister Kittie did the same thing until she married. She ate at his table and entertained her friends in his home. She received support for herself and child from her father's means and had her own pocket money from the farm produce. She had the friendship of her brother and the companionship and love of her innocent child in the old home. The father's grief for her former lapse forbids the thought that he had lost concern for her as his daughter, and the

denouement shows that she could have relied on his protection from further dishonor at any cost.   We do not hesitate to say that there is nothing in the testimony to warrant an inference that the relation between father and daughter was such that defendant was without fault in bringing about the necessity to kill.

At request of appellant the Court instructed the jury: "That the illicit intercourse of one with a female of well known unchaste character, with her consent, is not such provocation, if her want of chastity be known to her male relatives, as would reduce the homicide of the man by the relative to manslaughter.   And one found in intercourse with such woman under such circumstances, if assaulted by her relative under the facts herein supposed to exist, may defend himself from assault to the extent of taking human life, if it be necessary to protect his own life, or to protect his person from serious bodily harm, provided he did nothing more than this to bring on the difficulty, and there was no other safe means of escape, and provided the jury believe a reasonably firm person under the same circumstances would come to the same conclusion."   Whether this was a correct charge was not involved in the appeal.   Certainly it was as favorable to appellant as he could possibly expect, in so far as his contention rests upon the unchaste character of Belle Bailey, and should be fairly construed as a qualification of the rule stated in the Alabama case in accordance with appellant's view.

It remains to inquire whether the charge based upon the Alabama case was inapplicable for want of evidence tending to show that defendant armed himself with a deadly weapon, in anticipation that any one might or would interfere with his purpose, and with intent to take the life of another should it be necessary to save his own in the course of such interference.   A brief reference to the testimony will be sufficient to show that this contention is incorrect.   Reference has already been made to the fact that Emerson placed his pistol that night on top of his

clothes in reach from the side of the bed where he was. Emerson, in explanation of his being armed with a pistol, stated that as sergeant of the county chaingang he usually carried a pistol, and that he had it with him on this occasion, in anticipation that he might come across an escaped convict, and that he did not carry it in anticipation of interference with his visit to Belle Bailey. It was, however, for the jury to determine whether this was a satisfactory explanation of Emerson's having the pistol in Drake's house when not on duty, and of the apparently careful placing of it for quick use. Mary Bailey, in contradiction of her mother, testified that shortly after the homicide that night, her mother said in her presence that she heard her father when he got out of bed and begged Emerson to leave. If warned to leave in time to make his escape, did he remain with purpose to shoot his way out later, if necessary? Mention has been made of the witnesses who testified that Emerson, after the homicide, declared that Drake was the best target he ever shot at. Earle Mayfield testified that, two weeks after the homicide, Emerson told him that he had been warned to stay away from Drake's house, and that he knew he ought not to have gone there, and further said: "Mr. Drake appeared in the door again, and then, God damn him, I meant to kill him;" also, "I had the advantage of him as he was between me and the light." Ralph Drake testified that Belle Bailey told him that night that Allen Emerson had not been there but twice, and that he said he would come if it cost him his life.

Furthermore, an issue was raised in the testimony whether Drake fired his pistol at all that night. There was testimony that after careful search in the room and on the ground about the window, no bullet marks, other than those made by balls from Emerson's pistol, could be found, and no bullet from Drake's pistol could be found, and there was a conflict of testimony as to whether the pistol of Drake, found by his side with one empty shell, appeared to have been recently discharged.

The foregoing certainly constitutes some evidence tending to show that Emerson entered Drake's home for an unlawful purpose, and with the intention to use a deadly weapon against any one interfering with its accomplishment. If Emerson killed Drake pursuant to such formal design, it was murder.

The tenth exception assigns error in charging the jury: "If the evidence fails to show you by the preponderance of the evidence that he was without fault in bringing about the difficulty, then his plea of self-defense fails and you will say what offense he is guilty of—guilty of murder or guilty of manslaughter." It is contended that such charge was faulty, in eliminating the principle that one may not be without fault in bringing on a difficulty and yet his right of self-defense survives, if he shows an intention and desire to abandon the conflict, and further, that it eliminates the doctrine that defendant was entitled to an acquittal if there was a reasonable doubt of his guilt, although the evidence fails to establish the plea of self-defense. There was nothing in the testimony calling for a statement of the law touching the right of self-defense when one originally at fault withdraws from the difficulty in good faith, but conceding there was such testimony, the point was covered by charging appellant's fifth request to charge. So, also, in giving to the jury appellant's fourth request to charge, the jury were fully instructed to acquit the accused if there was a reasonable doubt on any material point. *State* v. *Way,* 38 S. C., 346, 17 S. E., 39; *State* v. *Way,* 76 S. C., 94.

The twelfth and thirteenth exceptions allege error in the failure to charge appellant's request: "That one is not obliged to retreat if thereby he increases his danger, provided he has not forfeited his right to self-defense in other respects." The Court, doubtless, did not deem it necessary to give this charge because he had previously, at request of appellant, instructed the jury that "the law, recognizing the imperfections of human nature, does not require that one charged with homicide should

show that there was no other possible means of escape when he struck the fatal blow, but he is only called upon to satisfy the jury that, under all the circumstances by which he was surrounded, he readily believed that there was a necessity for taking the life of his adversary in order to preserve his own, and that, in the opinion of the jury, these circumstances were such as to justify such a belief in the mind of a person of ordinary firmness and reason." The charge given was more favorable to the appellant than the charge refused, and more fully and clearly covered the point sought to be made. The request refused made the right not to retreat under certain circumstances depend upon whether retreat would *actually* increase the danger, and was coupled with a proviso so extensive as to cloud the point in the mind of the jury, whereas the charge given only imposed upon the defendant the duty of showing that he believed there was a necessity to kill, which involves the absence of reasonably safe means of escape or retreat, and that the circumstances justified such belief in an ordinary person.

The fourteenth exception imputes error in charging the jury: "If you conclude that the defendant was a trespasser in that house, and the trespassing was such as would be reasonably calculated to precipitate a conflict, then such trespasser could not be said to be without fault, and in that event such trespasser could not invoke the plea of self-defense." The error assigned being that the charge implied the right on the part of the deceased to assault the defendant with a deadly weapon and seek to kill him because he was a trespasser. This is an incorrect view of the charge. The Court did not use the term trespasser in the sense of one committing a simple trespass upon real property, as contended by appellant, but a trespasser in the sense disclosed by the evidence, and already discussed, and he left it to the jury to say whether such a trespass was committed by Emerson as was reasonably calculated to precipitate a conflict with the deceased in his home. The charge was correct and in accordance with the views heretofore announced.

After careful consideration of every exception, we find no ground for reversal.

The judgment of the Circuit Court is, therefore, affirmed.